Mary CLARKE, Administratrix ad Pros. of the Estate of William Clarke, Deceased, Plaintiff,

v.

Martin REISS and Branch Motor Express Company, Defendants.

Civ. A. No. 1195–55.

United States District Court
D. New Jersey.

Feb. 1, 1957.

Francis Sorin, Jersey City, N. J., for plaintiff.

John W. Taylor, East Orange, N. J., William F. Little, Jr., Newark, N. J., for defendants.

**WORTENDYKE, District Judge.**

This is a diversity death action based upon the alleged negligent operation of a motor truck which collided with the passenger automobile owned and being operated by plaintiff's intestate on a public highway in New Jersey. Pursuant to Rule 50(b) of the Rules of Civil Procedure for the District Courts of the United States, 28 U.S.C., the defendants move to have the verdict for plaintiff set aside and for judgment in their favor. The defendants' motion for dismissal, pursuant to Rule 50(a), which was made at the close of the evidence offered by the plaintiff, was denied, as was defendants' subsequent motion for a directed verdict as authorized by Rule 50(b).

The admitted collision occurred on November 12, 1955, between 5:00 and 5:15 a. m., in Newark, New Jersey, on United States Route 22, a dual concrete-paved highway, the lanes of which are separated by a dividing barrier. Although it was dark, the weather was clear and the pavement dry. While the combined tractor-trailer motor vehicle owned by the corporate and driven by the individual defendant was traveling in a general westerly direction on the highway,

its right front came into contact with the left rear corner of the Ford passenger automobile owned and operated by plaintiff's intestate. In consequence of this collision the intestate was instantly killed.

The only eye witness to the collision and the immediately following events was the defendant driver. His deposition was taken by the plaintiff, pursuant to Rule 26, and portions thereof were read into the record on the trial, as part of the plaintiff's case. These were supplemented by photographs of the respective vehicles and surroundings, taken within a few minutes after the collision, at the direction of the police department of the City of Newark, and by testimony of one of the police officers who came to the scene shortly after the collision had occurred. The defendant truck driver also testified in his own and in the truck owner's behalf upon the case for the defendants. It was conceded that the driver of the truck was acting as the employee of its owner within the scope of his employment at the time of the collision.

The motion presently before me, as did its precursor, the motion for direction of a verdict at the close of all of the evidence, poses the single question whether the evidence was sufficient to support a jury inference that the vehicular collision and fatal consequence, proximately resulted from negligence on the part of the defendant truck driver. The field within which such evidence is encompassed is the narrow one comprised of the testimony of the truck driver on his deposition and upon the trial, the photographs of the vehicles after they had come to rest following the collision and of the area within which the collision occurred, and the testimony of Police Officer Saveriano, as well as the contents of his official report of investigation of the accident.

Reduced to its simplest terms, the contention of the defendants upon the instant motion is that the adverse verdict of which they complain could only have resulted from pure speculation on

the part of the jury with respect to the issue of liability. Counsel for both parties concede that the evidence is suggestive of a variety of possibilities and the defendants urge that the very variety of such permissible inferences is indicative of an absence of preponderance of the evidence in support of one possible inference to the exclusion of others.

The evidence is uncontradicted that the truck was on its way from the New York metropolitan area to a destination in Pennsylvania, with a load of building material in the rack-body trailer portion of the vehicular combination. This cargo was covered with a tarpaulin which, before the particular trip commenced, was found to be securely lashed with no free or loose ends. The tractor portion of the vehicle was provided with four rear vision mirrors, one on each of the front fenders and one on each of the doors of the cab. The cab door mirrors projected outward from the sides of the cab to a greater distance than did the mirrors upon the fenders and all four of these facilities were intended to afford a view to the rear of the vehicle along each side thereof.

As the defendants' vehicle approached the scene of the accident, it passed over a viaduct marked only by a white line down the center, but capable of carrying two lanes of traffic in each direction. Four-tenths of a mile before the point of impact, the highway turns slightly to the left, westbound, and widens into a dual highway with concrete islands between east and west bound lanes. To provide access from the City streets to the westbound lane of the highway, there is an entrance ramp at the same point (four-tenths of a mile before the point of collision).

The westbound portion of the dual highway is 29 feet 4 inches wide overall, and is comprised of three strips of concrete, each separated from the others by a continuous seam or crack. The strip nearest the island is only about two feet in width, but when combined with the other two strips provides adequate space between the center island on the left and

the curb on the right for three lanes of cars or trucks, side by side. In addition to the seams between the concrete strips, there are two white lines on the westbound portion of the highway. One white line is solid, or continuous, and is tangent to the crack or seam between the narrow strip of concrete and the middle strip. The second white line is broken and runs approximately down the center of the middle strip. Thus, to be properly in the lane immediately to the right of the solid white line requires that a driver straddle the broken white line with the wheels of his vehicle. Similarly, to stay in the lane to the left of the broken white line requires the straddling of the solid white line. Between the broken white line and the right curb, there is more than enough room for two vehicles to run abreast of one another, although the pavement surface is not marked to so indicate.

As the truck left the viaduct and entered the westbound portion of the dual highway, it was traveling to the left of the broken white line with its wheels straddling the solid white line and the crack or seam between the left hand and center strips of concrete. The truck driver, intending to bring his westbound vehicle into the right hand lane most proximate to the side curb of the highway, testified that he turned on the illuminated directional signals with which his vehicle was equipped and gradually changed the course of his vehicle toward the right. The truck, by the driver's admission, was traveling at a speed of 40 miles an hour, with all of its lights illuminated; the headlights were set on low beam with their beams converging at a distance of approximately 56 feet ahead. The truck driver testified repeatedly that his rear vision mirrors were in fully effective condition and position, that his views by means of these mirrors to his rear were unobstructed, that he could see the roadway behind him to the entrance ramp previously mentioned, and that he saw no moving object or vehicle, with or without lights, behind him on the highway. The defendant driver was unable to recall how long in time or how far in distance before he commenced to change the direction of his vehicle he turned on his directional signals. Neither was he able to relate the respective observations which he made through his right hand and left hand mirrors to any specific point in time or location on the highway. He further testified that when he had changed direction a matter of a foot or fifteen inches to his right of the course on which he had been previously traveling, he struck the left rear corner of a passenger car with the right front portion of his tractor.

Photographs of the passenger car, after it came to rest at a point approximately 150 feet from that at which it was struck on the highway, indicate that almost the entire left side of the passenger car was stove in or sheared off. This vehicle, following the impact, left the paved surface of the highway, continued over the right hand curbing and for a distance on and along the grass-covered embankment along the north curb of the highway, to a point in the vicinity of a utility pole, where it came to rest. The body of plaintiff's intestate was thrown or fell out while his vehicle was in the described career. The truck driver brought his vehicle to a stop parallel with his right hand curb some 50 feet beyond the point on the highway pavement where the body of decedent had fallen.

The action was properly removed to this Court from a Court of the State of New Jersey, by reason of the diversity of citizenship of the parties, but the rights and obligations of the parties inter sese are governed by the law of New Jersey under Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. The legal principles which govern tort actions based on charges of negligence are well established in New Jersey and may be simply stated. The plaintiff's cause of action against the defendant, if any, derives from the New Jersey Death Act, which is now embodied in Chapter 31 of Title 2A of its

Revised Statutes, N.J.S.A. The plaintiff here, in invoking the New Jersey Statute, charges that the death for which the recovery of damages is sought resulted from the negligent operation by the defendants of their vehicle so as to cause it to strike the automobile of plaintiff's intestate.

We are immediately relegated to the principles of the law of negligence as established and recognized by the Courts of New Jersey. Negligence is never presumed. Indeed, there is a presumption against negligence. Hence, one who, as does the plaintiff here, charges another with negligence as the cause of damage and basis for recovery, assumes the burden of proving such causal negligence by the preponderance of the evidence. A bare scintilla of evidence is insufficient to carry the issue of negligence to the jury and the jury may not find negligence or its causal relationship to damage by means of pure speculation, but must be persuaded to that conclusion by the greater weight or persuasiveness of the evidence presented to it. While it is true that, in the absence of evidence to the contrary, a similar presumption of freedom from contributory negligence surrounds the decedent, this Court is not concerned with any question of contributory negligence in this case, nor do the defendants urge the existence thereof as a basis for their present motion. In their brief on this motion the defendants, by way of conclusion, urge "That the evidence offered supplies no proof of negligence on the part of the defendants that proximately caused the accident and resulting death."

The Court conceives that its duty upon this motion is to determine, after a careful scrutiny of all of the evidence which was before the jury, whether there is any evidence which, if believed by the jury, would support its finding against the defendants. In scanning the proof for the purposes of this motion, the facts must be viewed most favorably to the plaintiff's case and all reasonably possible inferences in support of the verdict must be drawn. Cheffey v. Pennsylvania Railroad Co., D.C.Pa. 1948, 79 F.Supp. 252; Eckenrode v. Pennsylvania Railroad Co., 3 Cir., 1947, 164 F.2d 996.

I am impelled to the conclusion that there was adequate basis in the proofs for a jury finding of causal negligence on the part of the defendant truck driver.

An examination of the photograph of the decedent's car taken after it came to rest at the scene, marked P–7 in evidence and being a view from the left rear of the vehicle toward its right front, indicates physical damage so extensive and severe as to induce a reasonable inference that it resulted from the application of a sudden and extreme force which evidently sheared and crushed the body of the passenger car with the initial impact at the left rear corner. As will be noted in P–10, another photograph taken at the same time, looking from the left front toward the right rear of the passenger car, there was a complete absence of any evidence of damage to any portion of the vehicle forward of the left hand door, or along its right side. Two photographs of the truck were also taken at the scene, as it stood close to and parallel with the northerly curb of the highway, after the accident had occurred. P–8 is a view of the right front of the tractor-hood, right front fender, right front fender mirror, front bumper and radiator grille shield, and head and fog lights. P–9 is a directly frontal view of the tractor showing all four corners and the cab and right front corner portion of the tarpaulin covered rack-body of the trailer. P–8 discloses evidence in the form of dents, abrasions and distortion of attachments on the forward portion of the tractor from which it appears with reasonable probability that the right front portion of the tractor, to an extent of at least one-quarter of the width of the front of the vehicle, had been in contact with a solid object. From all of the foregoing eloquent though silent features of the evidence, I must conclude that the jury appropriately inferred that the truck driver drove against the passenger car from the

latter's left rear, with terrific force. It was, of course, conceded that the passenger car was nearer to the right hand curb than was the truck at the moment of the collision and was in its (the passenger car's) right hand lane of the highway.

The truck driver testified that by means of his four outside mirrors he had a view of the highway behind him for a distance of four-tenths of a mile. He stated that although he looked to the rear by means of these facilities he saw nothing. He says that his speed at the time he made the observations was 40 miles per hour, at which rate he would be moving approximately 60 feet per second. If the decedent's automobile was within the four-tenths of a mile distance over which the truck driver admits that he had a view before he changed the direction of his vehicle, the truck driver either saw the passenger car or neglected to observe it. The jury had a right to conclude that if such was the situation, respecting the location of the passenger vehicle in relation to the truck, and if the driver of the truck looked and failed to see the passenger car, he could not have looked effectively. If the passenger car, on the other hand, was not within the four-tenths of a mile distance to the rear of the truck when the driver made his observation, the passenger car would have had to travel at incredibly high speed in order to draw abreast and partly ahead of the truck as the latter was negotiating the minimal change in direction which the truck driver stated had occurred before the collision. In such a situation, the high speed of the passenger car in relation to the stated speed of the truck would not have permitted the crushing, shearing effect of the collision as disclosed in the photographs of the passenger car.

There remains a further alternative inference for the jury to draw from the evidence in this case. If the truck were not overtaken by the passenger car, but overtook the same, then there was an obvious basis for jury inference that the truck driver was not making reasonably

effective observations to the *front*, since he testified that he had a view ahead to an overpass approximately four-tenths of a mile in a westerly direction and saw nothing but the tail lights of a vehicle or vehicles traveling in the same direction, at some distance ahead of him.

The jury was properly instructed that if it found that the truck driver (there being no evidence respecting the conduct of the driver of the passenger car) violated a provision of the New Jersey Traffic Law, while such a violation was not in and of itself conclusive of negligence on the truck driver's part, it was a factor which the jury might consider, together with all of the other evidence in the case, in appraising the propriety of the truck driver's conduct.

■ Since, in my opinion, under the favorable inferences which we must draw in support of the verdict, the jury was reasonably justified in the proofs in reaching the conclusion which it returned, this Court has no right to disturb the verdict, and, therefore, the motions are denied and an order in accordance with this opinion may be presented.